USDC-SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC#:
DATE FILED: 2/22/18

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

VUGO, INC.,

                Plaintiff,

v.

CITY OF NEW YORK,

                Defendant.

---

No. 15-CV-8253 (RA)

OPINION & ORDER

RONNIE ABRAMS, United States District Judge:

Citing an interest in promoting and protecting passenger comfort, the New York City Taxi and Limousine Commission ("TLC") promulgated rules that prohibit the display of advertising in certain types of for-hire vehicles without prior authorization. Although the TLC's regulatory scheme permits advertising in medallion taxis and street-hail liveries, it is effectively banned in all other vehicles. Vugo, Inc., a Minnesota-based company that places digital content, including advertising, in rideshare vehicles such as those affiliated with Uber and Lyft across the country, has sought to expand its business into New York City. After the TLC refused Vugo authorization to do so, it brought this First Amendment challenge.

Both Vugo and the City now move for summary judgment. Because the City is unable to justify the challenged regulations, even under the relaxed judicial scrutiny applied to restrictions on commercial speech first articulated in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, Vugo's motion is granted and the City's motion is denied.

## BACKGROUND

The following facts, which are based on the parties' Rule 56.1 statements and supporting materials, are undisputed unless otherwise noted.[1] The TLC, a City agency, is responsible for the "regulation and supervision" of vehicles for hire in the City. N.Y.C. Charter § 2303(a). In connection with its obligation to establish a comprehensive transportation policy, it is tasked with considering, among other things, "the promotion and protection of the public comfort." *Id.* § 2300. Its authority extends to "[t]he regulation and supervision of standards and conditions of service," *id.* § 2303(b)(2), and it is expressly empowered to establish "standards of . . . comfort . . . in the operation of vehicles and auxiliary equipment," *id.* § 2303(b)(6). As of August 2016, the TLC oversaw more than 94,000 vehicles, including medallion taxis and for-hire vehicles ("FHVs").[2] Def. 56.1 ¶¶ 3-4, ECF No. 47. The following vehicles are considered FHVs: community-based liveries, black cars, luxury limousines, and street-hail liveries ("SHLs").[3] Def. 56.1 ¶ 5.

The TLC currently allows two types of regulated vehicles to display interior advertising: medallion taxis and SHLs. Pl. 56.1 ¶¶ 10, 12, 14, ECF No. 39. Medallion taxis are New York City's ubiquitous "yellow cabs." Pl. 56.1 ¶ 4. SHLs, which are commonly known as "green" or "borough" taxis, are a relatively new class of FHVs that are authorized to accept street hails in the Bronx, Brooklyn, Queens (with the exception of the airports), Staten Island, and in certain parts of

---

[1] These include the following submissions made in connection with the parties' respective motions for summary judgment: Plaintiff's Rule 56.1 Statement ("Pl. 56.1"), Defendant's Rule 56.1 Statement ("Def. 56.1"), Defendant's Response to Plaintiff's Rule 56.1 Statement ("Def. Resp. to Pl. 56.1"), and the Declaration of Ryan Wanttaja in Support of Defendant's Motion for Summary Judgment ("Wanttaja Decl."). Where facts stated in a Rule 56.1 statement are supported by testimonial or documentary evidence, and denied solely by a conclusory statement by the other party without citation to conflicting testimonial or documentary evidence, the Court finds such facts to be true. *See* S.D.N.Y. Local Rule 56.1(c)-(d).

[2] The New York City Administrative Code defines "for-hire vehicle" as "a motor vehicle carrying passengers for hire in the city, with a seating capacity of twenty passengers or less, not including the driver, other than a taxicab, coach, wheelchair accessible van, commuter van or an authorized bus operating pursuant to application provisions of law." N.Y.C. Admin. Code § 19-502(g).

[3] Unless otherwise specified, all further references to "FHV" will not include SHLs and instead refer only to those FHVs that are not permitted to display advertisements: community-based liveries, black cars, and luxury limousines.

Manhattan. Def. 56.1 ¶¶ 5, 30. In addition to being the only two types of regulated vehicles allowed to display interior advertising, medallion taxis and SHLs are also the only regulated vehicles that accept street hails. Def. 56.1 ¶ 31.

Before May 2005, no TLC-regulated vehicles were authorized to display interior advertising. *See* Def. 56.1 ¶ 13; Wanttaja Decl. ¶ 22, ECF No. 50. The rules being challenged in this action, which prohibit interior advertising in FHVs, were originally adopted as a single rule (the "Original Rule") on August 5, 1999. *See* Pl. 56.1 ¶ 3. The Original Rule provided, in relevant part, that "[a]n owner may not display any advertising, either on the exterior or the interior of a for-hire vehicle, unless such advertising has been authorized by the Commission." Wanttaja Decl. Ex. B, at NYC0263. It was adopted "to establish consistency between TLC's regulation of advertising in medallion taxicabs and FHVs." Wanttaja Decl. ¶ 20. The rule governing interior advertising in medallion taxis at the time prohibited taxicab owners from "display[ing] inside a taxicab any advertising or other notice not specifically authorized by [the Taxicab Owners Rules] or the Commission's Marking Specifications for Taxicabs unless approved by the Commission." Wanttaja Decl. Ex. A, at NYC0452.

The Original Rule was codified at 35 R.C.N.Y. § 6-12(f)(2). Wanttaja Decl. Ex. B, at NYC0263. In 2010, the Original Rule was re-codified as 35 R.C.N.Y. § 59A-29(e)(1) as part of a reorganization of the TLC's rulebooks. Wanttaja Decl. ¶ 21 n.7. The TLC also adopted a parallel provision that applies to FHV owners, which is codified at 35 R.C.N.Y. § 59B-29(e)(1). Pl. 56.1 ¶ 6. The language in these provisions differs somewhat from the Original Rule, but the parties agree that the differences are not "substantive." Pl. 56.1 ¶ 4; Wanttaja Decl. ¶ 21 n.7. In its current form, 35 R.C.N.Y. § 59A-29(e)(1) provides that "[a]n Owner must not display any advertising on the exterior or the interior of a [FHV] unless the advertising has been authorized by the

3

Commission and a License has been issued to the Owner following the provisions of the Administrative Code." Similarly, 35 R.C.N.Y. § 59B-29(e)(1) provides that "[a] Vehicle must not display advertising on the outside or the inside unless the Commission has authorized the advertising and has given the Vehicle Owner a permit specifying that the advertising complies with the Administrative Code."

The TLC disfavors interior advertising in all of the vehicles that it licenses and regulates. Wanttaja Decl. ¶¶ 25, 28, 52. "Because the Commission had authorized no form of interior advertising in taxicabs or FHVs prior to 1999, passage of the rule did not alter the fundamental fact that advertising was not authorized in either taxicabs or FHVs at that time. Rather, the rule was intended to make clear that interior advertising was not permitted and inform licensees that they could not display interior advertising without prior TLC authorization." Wanttaja Decl. ¶ 22.

The TLC allows advertising in medallion taxicabs and SHLs for one reason: to offset the costs associated with the technology systems that must be installed in those vehicles. *See* Def. 56.1 ¶ 28; Wanttaja Decl. ¶ 47. In 2004, the TLC

> promulgated rules requiring [medallion] taxicabs . . . to install equipment capable of performing the following functions: (1) electronic receipt and collection of trip data; (2) acceptance of debit cards and credit cards for payment; (3) driver receipt of text messages; and (4) display of route guidance and other important information to passengers via passenger information monitors ["PIMs"].

Wanttaja Decl. ¶ 30. The new equipment was intended to serve a variety of policy objectives. The goal of the electronic receipt and collection of trip data was to establish "an efficient and accurate method of maintaining information regarding the date, time, and location of passenger pick-ups and drop-offs, duration of the trip, the number of passengers, and the metered fare paid by the passenger(s), among other data." Wanttaja Decl. ¶ 31. This electronic collection of data was intended to allow the TLC to "more efficiently synthesize and analyze this enormous volume of data so as to guide the agency in its day-to-day operations and larger policy decisions." Wanttaja

4

Decl. ¶ 31. The acceptance of debit and credit cards was intended to provide a convenience for passengers and improve the safety of drivers, as they would presumably carry less cash. Wanttaja Decl. ¶ 32. The purpose behind the text messaging system was threefold: (1) "to communicate public service announcements and emergency notifications to taxicab drivers"; (2) "to assist in the recovery of lost property"; and (3) "to inform drivers of fare opportunities, which [would] improve[ ] overall customer service." Wanttaja Decl. ¶ 33. The PIM was intended "to display the total fare at the end of every trip, communicate public service announcements to passengers, allow passengers to track their route, and allow passengers to complete credit card payments." Wanttaja Decl. ¶ 34. The purpose of these features was to prevent customers from being overcharged by providing them with greater transparency with respect to their fare and route. Wanttaja Decl. ¶ 34.

The equipment contemplated by these rules came to be known as the Taxicab Passenger Enhancement Program ("TPEP"), which is now required to be installed in all medallion taxis. Def. 56.1 ¶¶ 8-9; Wanttaja Decl. ¶ 13. A similar system called the Street Hail Livery Technology System ("LPEP") must be installed in SHLs. Wanttaja Decl. ¶ 44. The TPEP and LPEP requirements "added a significant new cost to vehicle owners without any expectation of increased business." Wanttaja Decl. ¶ 47. "[A]s a means by which owners could offset the new costs," the TLC crafted an exception to its ban on interior advertising and promulgated new rules authorizing interior advertising on the PIMs of medallion taxis and SHLs. Wanttaja Decl. ¶ 47; *see also* Pl. 56.1 ¶¶ 10, 12-13.[4] Consequently, as of August 2016, interior advertising was permitted in about twenty-two percent of the vehicles licensed and regulated by the TLC. Def. 56.1 ¶ 27.[5]

---

[4] Although neither of the current LPEP providers offers a PIM-less system, LPEPs are not required to have a PIM. *See* Wanttaja Decl. ¶ 45 & n.13. Interior advertising is not permitted, however, in SHLs that have LPEPs without PIMs. Def. 56.1 ¶ 21; *see also* 35 R.C.N.Y. § 83-31(d)(4)(v).

[5] As of August 2016, there were 13,576 medallion taxis, 80,647 FHVs, 289 paratransit vehicles, and 471 commuter vans licensed by the TLC. Def. 56.1 ¶¶ 6-7. Of the 80,647 FHVs, 18,848 were liveries, 49,801 were black cars, 5,119 were luxury limousines, and 6,879 were SHLs. Def. 56.1 ¶ 7.

5

Formed in 2015, Vugo is a media distribution company headquartered in Minneapolis, Minnesota that distributes advertisements, entertainment content, and public service announcements. Pl. 56.1 ¶¶ 16-17. Vugo partners with rideshare drivers affiliated with companies such as Uber and Lyft. Pl. 56.1 ¶ 18. Drivers download Vugo's software onto tablets that are mounted in their vehicles in a manner that allows passengers to view and interact with the tablets. Pl. 56.1 ¶ 18. Approximately seventy-five percent of the screen displays primary content—typically video—while the remaining portion is a static display related to the main content, the Vugo logo, and volume controls. Pl. 56.1 ¶ 27. Passengers cannot turn off the display, but they can reduce the volume to a "near-mute" level. Pl. 56.1 ¶ 30. Advertisers pay Vugo to display their content and Vugo provides the drivers with sixty percent of the advertising revenue. Pl. 56.1 ¶ 32.

In the spring of 2015, Vugo launched its beta program, making the platform available to ride-share drivers across the country. Pl. 56.1 ¶ 33. During the beta period, a driver from New York City informed Vugo that TLC rules banned advertising in for-hire vehicles. Pl. 56.1 ¶ 34. Vugo contacted the TLC about entering the New York market and was informed that its product was prohibited because FHVs are not permitted to display advertisements. Pl. 56.1 ¶¶ 35-37.[6]

## II. PROCEDURAL HISTORY

On October 20, 2015, Vugo filed a Complaint alleging that the TLC's ban on advertising in FHVs violates the First Amendment. ECF No. 1. Before the Court are the parties' cross-motions for summary judgment. ECF Nos. 38, 45.

---

[6] Although the challenged ordinances specify that the TLC may grant permits allowing the display of otherwise prohibited advertisements, the uncontroverted evidence is that the TLC does not—and has no intention to—issue such permits. *See* Pl. 56.1 ¶¶ 15, 36-37, 39; Def. Resp. to Pl. 56.1 ¶¶ 15, 36-37, 39.

## STANDARD OF REVIEW

A party is entitled to summary judgment if it "shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if it might affect the outcome of the suit under the governing law, and a dispute is genuine if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Baldwin v. EMI Feist Catalog, Inc.*, 805 F.3d 18, 25 (2d Cir. 2015) (citation and internal quotation marks omitted). "[T]he moving party bears the burden of demonstrating the absence of a material factual question, and in making this determination, the court must view all facts 'in the light most favorable' to the non-moving party." *VW Credit, Inc. v. Big Apple Volkswagen, LLC*, No. 11-CV-1950 (PAE), 2012 WL 5964393, at *2 (S.D.N.Y. Nov. 29, 2012) (quoting *Dickerson v. Napolitano*, 604 F.3d 732, 740 (2d Cir. 2010)).

"When cross motions for summary judgment are made, the standard is the same for that of individual motions." *JPMorgan Chase Bank, N.A. v. Freyberg*, 171 F. Supp. 3d 178, 184 (S.D.N.Y. 2016). "[N]either side is barred from asserting that there are issues of fact, sufficient to prevent the entry of judgment, as a matter of law, against it." *Heublein, Inc. v. United States*, 996 F.2d 1455, 1461 (2d Cir. 1993). "[E]ach party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration." *Morales v. Quintel Entm't, Inc.*, 249 F.3d 115, 121 (2d Cir. 2001).

Because there are no genuine disputes of material fact, whether either party is entitled to summary judgment will turn entirely upon the City's ability to satisfy its burden under the appropriate level of judicial scrutiny.

# DISCUSSION

The First Amendment, applicable to the States through the Fourteenth Amendment, prohibits the enactment of laws "abridging the freedom of speech." U.S. CONST. AMEND. I. "Under that Clause, a government, including a municipal government vested with state authority, has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Reed v. Town of Gilbert*, 135 S. Ct. 2218, 2226 (2015) (citation and internal quotation marks omitted). When a law is challenged under the First Amendment, the degree of scrutiny applied by courts is often dictated by whether the law restricts speech based on its substance: content-based laws generally receive strict scrutiny whereas content neutral laws are subject to less exacting forms of judicial review. *See id.* at 2232.

In *Reed v. Town of Gilbert*, the Supreme Court explained what it means for a law to be content based: "Government regulation of speech is content based if a law applies to particular speech because of the topic discussed or the idea or message expressed." *Id.* at 2227. "Some facial distinctions based on a message are obvious, defining regulated speech by particular subject matter, and others are more subtle, defining regulated speech by its function or purpose." *Id.* Moreover, "laws that cannot be justified without reference to the content of the regulated speech, or that were adopted by the government because of disagreement with the message the speech conveys" are similarly considered content-based. *Id.*

Here, the parties do not dispute that the regulations are content-based. The Court discerns no basis for concluding otherwise. The prohibition extends exclusively to advertising. To ascertain whether particular material is subject to the ban, a city official would need to review the content in order to assess if it constitutes "advertising." *See id.*; *see also Centro de la Comunidad*

*Hispana de Locust Valley v. Town of Oyster Bay*, 868 F.3d 104, 112 (2d Cir. 2017) (city ordinance was content based where it proscribed conduct done "for the purpose of soliciting employment").

Although content-based laws generally receive strict scrutiny, in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, the Supreme Court carved out an exception for laws that target commercial speech—and therefore are necessarily content-based. *See* 447 U.S. 557, 565-66 (1980). Commercial speech is defined as any "expression related solely to the commercial interest of the speaker and its audience." *Id.* at 561. Because "speech proposing a commercial transaction . . . occurs in an area traditionally subject to government regulation," *id.*, where a content-based regulation is aimed solely at commercial speech courts have traditionally applied the relaxed form of judicial scrutiny described in *Central Hudson*, *see Matal v. Tam*, 137 S. Ct. 1744, 1763-64 (2017). Although at first glance, the regulations here—which apply only to "advertising"—seem concerned exclusively with commercial speech, Vugo nonetheless makes two arguments as to why strict scrutiny should still apply.

First, Vugo contends that, without explicitly repudiating *Central Hudson*, the Supreme Court's "recent decisions demonstrate that to sustain a ban on speech enacted simply because that speech is commercial in nature, government bodies face the nearly insurmountable burden of strict scrutiny." Pl. MSJ, at 10, ECF No. 40. This position is not completely devoid of merit. In *Greater New Orleans Broadcasting Ass'n, Inc. v. United States*, for instance, the Supreme Court recognized both that it has applied *Central Hudson* "more strictly" in the years since it first formulated the test and that various commentators have urged for the test's repudiation in favor of a more "straightforward and stringent" standard, an invitation the Court declined to accept at that time. 527 U.S. 173, 182-84 (1999). More recently, Justice Thomas, writing for the majority in *Reed*, defined as "presumptively unconstitutional" regulations that "appl[y] to particular speech

9

because of the topic discussed or the idea or message expressed." 135 S. Ct. at 2222. Particularly in light of Justice Thomas' skepticism towards the *Central Hudson* standard, *see, e.g., Lorillard Tobacco Co. v. Reilly*, 533 U.S. 525, 572 (2001) (Thomas, J., concurring in part and concurring in the judgment), some have speculated that, following *Reed*, regulations targeting commercial speech may now be subject to strict scrutiny, *see, e.g.,* Note, *Free Speech Doctrine After Reed v. Town of Gilbert*, 129 Harv. L. Rev. 1981, 1990 (May 2016). Even Vugo acknowledges, however, that *Central Hudson* has not been explicitly overturned. Pl. MSJ, at 10. Consistent with other district courts in this Circuit, the Court thus declines to stray from such well-established doctrine absent an express holding from either the Supreme Court or the Court of Appeals for the Second Circuit. *See, e.g., Boelter v. Hearst Commc'ns, Inc.*, 192 F. Supp. 3d 427, 447 n.10 (S.D.N.Y. 2016).

Second, as Vugo correctly notes, there is undisputed evidence in the record that the TLC regulations have also prohibited the display of speech that is not commercial in nature, such as public service announcements, Pl. 56.1 ¶ 26, and political advertisements, Tr. 8:8-18, July 27, 2017, ECF No. 60. Both parties agree, however, that at its core this case is about commercial speech. *See* Tr. 25:21-26:1, July 27, 2017. Indeed, the City invites the Court to construe the regulations so as to apply *only* to commercial speech, Def. Supp. Br., at 8, ECF No. 59, thereby ensuring that the TLC's regulations are not subject to strict scrutiny. And Vugo, in spite of advancing the arguments above, does not object to the Court applying *Central Hudson*. *See* Tr. 27:5-9, July 27, 2017. Ultimately, the Court need not adjudicate the precise level of scrutiny required because the regulations at issue cannot pass constitutional muster under either standard. Accordingly, following the example set by the Supreme Court and the Second Circuit, this Court will assess the merits of Vugo's challenge under the less demanding *Central Hudson* standard.

*See, e.g., Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011) (declining to assess whether the regulation at issue reached non-commercial speech and applying *Central Hudson* because "[a]s in previous cases[] . . . the outcome is the same whether a special commercial speech inquiry or a stricter form of judicial scrutiny is applied"); *Centro*, 868 F.3d at 112 n.2.

## I. The *Central Hudson* Standard

Under *Central Hudson*, the constitutionality of a statute regulating commercial speech is determined by a four-part test. The first two prongs are threshold inquiries: (1) "the speech in question must not be misleading and must concern lawful activity" and (2) "the asserted government interest [justifying the restriction] must be substantial." *United States v. Caronia*, 703 F.3d 149, 164 (2d Cir. 2012). "If both inquiries yield positive answers," *Central Hudson*, 447 U.S. at 566, then the Court proceeds to the final two prongs: (3) "the regulation must directly advance the governmental interest asserted . . . to a material degree"; and (4) "the regulation must be narrowly drawn, and may not be more extensive than necessary to serve the interest," *Caronia*, 703 F.3d at 164 (citation and internal quotation marks omitted).

### A. The Threshold Inquiries

Here, the first two prongs of *Central Hudson* are satisfied. The parties do not dispute that the regulations target speech that is not unlawful or misleading. The Court discerns no basis for concluding otherwise. *See Centro*, 868 F.3d at 113-14 ("In sum, the First Amendment offers no protection to speech that proposes a commercial transaction if consummation of that transaction would *necessarily* constitute an illegal act." (emphasis in original)).

The City has also articulated a substantial interest. In assessing the government interest, the Court "must identify with care the interests the State itself asserts. Unlike rational-basis review, the *Central Hudson* standard does not permit us to supplant the precise interests put forward by the State with other suppositions." *Edenfield v. Fane*, 507 U.S. 761, 768 (1993). The

11

City has consistently justified the advertisement ban on the basis that advertisements annoy passengers. It is well-settled that government entities have a "substantial" interest in protecting the aesthetic appearance of cities, *Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent*, 466 U.S. 789, 807 (1984), and in protecting the public from "undue annoyance," *Vill. of Schaumburg v. Citizens for a Better Env't*, 444 U.S. 620, 636 (1980). Moreover, the Supreme Court has upheld the refusal by a municipality to display political ads on public buses in order "minimize . . . the risk of imposing upon a captive audience." *Lehman v. Shaker Heights*, 418 U.S. 298, 304 (1974). Because the Court answers both of the first prongs in the affirmative, the analysis now turns to the final two elements.

### B. The Fit Between the Ends and the Means

"The last two steps in the [*Central Hudson*] analysis have been considered, somewhat in tandem, to determine if there is a sufficient fit between the regulator's ends and the means chosen to accomplish those ends." *Bad Frog Brewery, Inc. v. N.Y. State Liquor Auth.*, 134 F.3d 87, 98 (2d Cir. 1998) (citation and internal quotation marks omitted). "The burden to establish that 'reasonable fit' is on the governmental agency defending its regulation, though the fit need not satisfy a least-restrictive-means standard." *Id.* (citation omitted).

It is here that the City is unable to satisfy its burden under *Central Hudson* and Vugo is therefore entitled to judgment as a matter of law. The fit between the ends sought by the City and the chosen means is, simply put, an unreasonable one. In short, the City's regulations are both under-inclusive in that large swaths of the vehicles regulated by the TLC, *i.e.*, taxis and SHLs, are permitted to display advertisements and unnecessarily restrictive because passengers in non-exempt vehicles could be protected from the dangers identified by the City by means less severe than a complete prohibition on advertising. This combination persuades the Court that the City has failed to craft a policy with a "sufficient fit" to the ends it seeks.

### 1. Material Advancement of the Government Interest

To satisfy the third prong of *Central Hudson*, the City must demonstrate that "the harms it recites are real and that its restriction will in fact alleviate them to a material degree." *Edenfield*, 507 U.S. at 771. In substantiating the harm, the City is not required to produce "empirical data . . . accompanied by a surfeit of background information." *Lorillard*, 533 U.S. at 555 (citation and internal quotation marks omitted). Instead, the Supreme Court has "permitted litigants to justify speech restrictions by reference to studies and anecdotes pertaining to different locales altogether[] . . . ." *Id.* (citation and internal quotation marks omitted). A restriction will fail this third prong of *Central Hudson* if it "provides only ineffective or remote support for the government's purpose." *Bad Frog Brewery*, 134 F.3d at 98 (citation and internal quotation marks omitted). Moreover, "[t]he Supreme Court has made it clear in the commercial speech context that under[-]inclusiveness of regulation will not necessarily defeat a claim that a state interest has been materially advanced." *Id.* In assessing whether under-inclusiveness precludes a policy from materially advancing the government interest, courts consider both the degree to which the regulation is under-inclusive, *see City of Cincinnati v. Discovery Network, Inc.*, 507 U.S. 410, 417-18 (1993), and the government's rationale for crafting such a policy, *see id.* at 424.

Contrary to Vugo's argument, the City has substantiated the harm it seeks to remedy, in particular by providing survey data. In response to a 2011 survey of taxi passengers nearly one-third of respondents indicated that "Taxi TV is annoying." Wanttaja Decl. Ex. C, at NYC0482. Passengers have further complained about the following aspects of TPEP: the blinking screen causes motion sickness; the buttons to lower the volume and turn off the PIM often do not work; and the content is repetitive and boring. *See generally* Wanttaja Decl. Exs. D, K. Passengers have also singled out advertisements as especially irritating. *See* Wanttaja Decl. Ex. K, at NYC0438.

13

Vugo further contends that the under-inclusive nature of the regulations precludes the City from satisfying its burden under the third prong of *Central Hudson*. Specifically, Vugo argues that, as was the case in *City of Cincinnati v. Discovery Network, Inc.*, where the Supreme Court struck down a policy requiring the removal of news racks distributing commercial handbills—only 62 of the 1,500-2,000 news racks in the city, 507 U.S. at 417-18—the TLC's regulations are "selective" due to the exemption of taxis and SHLs, Pl. MSJ, at 15. The City counters that its policy contains a far lesser proportion of exemptions than the regulation challenged in *City of Cincinnati*. In particular, the City notes that if the TLC's regulations are invalidated, interior advertising would be permissible in 73,768 additional vehicles, a potential 450% increase. Def. 56.1 ¶ 24. The City, however, exaggerates the degree to which the ban materially advances the stated interest, for two reasons. First, although taxis do comprise a minority of the vehicles regulated by the TLC, as of June 25, 2016 taxis accounted for 371,257 daily trips while Uber and Lyft, respectively, provided 179,647 and 33,401 daily trips. *See* Bellefeuille Decl. ¶ 4, ECF No. 52. Second, there is no guarantee that, absent the ban, all, or even a majority of, FHV owners would even elect to display advertisements.

The more compelling factor, in any event, is the City's failure to provide a sufficient rationale for exempting taxis and SHLs. In *City of Cincinnati*, for instance, the fact that such a large number of news racks were exempt from the policy was not dispositive. Instead, the Supreme Court's analysis turned on the municipality's justification for the exemption: prohibiting news racks distributing commercial handbills while allowing those that distributed non-commercial publications "b[ore] no relationship *whatsoever* to the particular interests that the city ha[d] asserted"—aesthetics and safety. 507 U.S. at 424-26 (emphasis in original).

14

Here, the City attempts to justify the exemptions to the ban on the basis that taxis and SHLs are, respectively, required to have TPEPs and LPEPs. Def.'s 56.1 ¶¶ 8-9, 15; Wanttaja Decl. ¶¶ 13, 44, 47. The TPEP and LPEP requirements "add[] a significant new cost to vehicle owners without any expectation of increased business." Wanttaja Decl. ¶ 47. These costs persuaded the TLC to allow an exception to its general rule against interior advertising. Wanttaja Decl. ¶ 47; *see also* Pl. 56.1 ¶¶ 10, 12-13. The problem, however, is that this rationale for exempting taxis and SHLS from the advertising ban "bears no relationship whatsoever" to the interest articulated by the City of protecting citizens from annoyances. *See City of Cincinnati*, 507 U.S. at 424.

Even the primary authorities upon which the City relies—*Members of the City Council of the City of Los Angeles v. Taxpayers for Vincent* and *Metromedia, Inc. v. City of San Diego*—belie its argument. In both cases, signs were prohibited in certain contexts and not in others, but in each instance the rationale underlying the under-inclusive policy bore a direct relationship to the municipality's interest in regulating the speech at issue. In *Taxpayers for Vincent*, for example, the regulatory scheme at issue banned the posting of signs for aesthetics purposes, but exempted private landowners, in part due to owners' interest in their land, which would most likely keep their posting of signs "within reasonable bounds." 466 U.S. at 811.[7] Similarly, in *Metromedia*, the Court concluded that, because the regulation pertained to commercial speech, it was reasonable to exempt onsite advertising from the ban at issue, in part because "offsite advertising, with its periodically changing content, [may] present[] a more acute problem [aesthetically] than does onsite advertising." 453 U.S. 490, 511 (1981).

---

[7] The regulation at issue in *Taxpayers for Vincent* was content neutral and the Supreme Court thus did not apply the *Central Hudson* test. *See* 466 U.S. at 789-90. The Supreme Court's analysis regarding under-inclusiveness, however, is still relevant, particularly given the degree to which the City relies upon it.

The Supreme Court has also looked to the relationship between the articulated state interest and the rationale for crafting an under-inclusive policy in assessing other challenges to restrictions on commercial speech. In *Rubin v. Coors Brewing Co.*, for instance, the Court invalidated a regulation prohibiting the specification of alcoholic content on beer labels—intended to prevent advertising "strength wars"—in part because (1) the practical effect of the regulatory regime was to allow such statements in beer *advertisements* and (2) labels on bottles of other types of alcoholic beverages were not subject to the ban. 514 U.S. 476, 488 (1999). The Court of Appeals for the Second Circuit has employed similar logic. *See, e.g., Clear Channel Outdoor, Inc. v. City of New York*, 594 F.3d 94, 108 (2d Cir. 2010) (upholding a regulation, partially on the basis that the court "defer[red] to the City's judgment that unregulated signage and billboards are a greater eyesore than coordinated street furniture bearing advertisements," which were exempt).

Here, however, there is no basis for concluding that advertisements in the exempted vehicles are somehow less annoying or that those passengers are any less vulnerable. Rather, the rationale for exempting taxis and SHLs, *i.e.*, the costs associated with TPEP and LPEP, exists only because the City has mandated that those vehicles install such systems and subsequently allowed drivers to recoup the resulting costs specifically by displaying advertisements. Were the City permitted to justify the under-inclusiveness of the ban on this basis, the reasonable fit prong of *Central Hudson* would lose much of its force. Municipalities would be able to selectively restrict commercial speech on nearly any basis. It is true that the TPEP and LPEP requirements allegedly derive from the primary functional difference between the exempted vehicles and FHVs: taxis and SHLs accept street hails while FHVs do not. This difference, however, similarly bears no relationship to the protection of citizens from advertisements. The regulations thus fail to directly advance the City's stated interest to a material degree. *See Caronia*, 703 F.3d at 164.

## 2. Narrowly Drawn

The *Central Hudson* test does not require the municipality to employ the "least restrictive means." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 477 (1989). Rather, the means must only be "narrowly drawn and no more extensive than reasonably necessary to further substantial interests." *Id.* (citation and internal quotation marks omitted). "[I]f there are numerous and obvious less-burdensome alternatives to the restriction on commercial speech" that weighs against the conclusion that the fit between the ends and means is reasonable. *City of Cincinnati*, 507 U.S. at 417 n.13. As the Supreme Court has noted, "[n]one of our cases invalidating the regulation of commercial speech involved a provision that went only marginally beyond what would adequately have served the governmental interest. To the contrary, almost all of the restrictions disallowed under *Central Hudson*'s fourth prong have been substantially excessive, disregarding far less restrictive and more precise means." *Fox*, 492 U.S. at 479; *see also Shapero v. Ky. Bar Ass'n*, 486 U.S. 466, 476 (1988) (complete prohibition on allowing attorneys to solicit legal business for pecuniary gain by sending truthful, non-deceptive letters to potential clients violated the First Amendment because "[t]he state can regulate such abuses and minimize mistakes through far less restrictive and more precise means, the most obvious of which is to require the lawyer to file any solicitation letter with a state agency"); *Zauderer v. Office of Disciplinary Counsel of Supreme Court of Ohio*, 471 U.S. 626, 648-49 (1985) (complete ban on illustrations in attorney advertisements violated the First Amendment, in part because the state failed to demonstrate that "potential abuses associated with the use of illustrations in attorneys' advertising cannot be combated by any means short of a blanket ban"); *Centro*, 868 F.3d at 116-18 (statute not narrowly drawn where, allegedly in furtherance of ensuring pedestrian and traffic safety, regulation prohibited all roadside solicitation of employment, in part because there were a number of ways to promote the asserted interest "while limiting the impact on constitutionally protected

17

speech"); *cf. Long Island Bd. of Realtors, Inc. v. Inc. Vill. of Massapequa Park*, 277 F.3d 622, 628 (2d Cir. 2002) ("[T]he restrictions on the number, size, and location of signs, the duration for which signs may remain on residential property, and the presence of off-site commercial advertising [were constitutional because they] further[ed] the Village's interest in aesthetics and safety while permitting the Board to display signs to inform people of the availability of a home.").

Whether the City has satisfied its burden with respect to the fourth prong is a closer question. The Court is sensitive to the fact that the City is not obligated to employ the least restrictive means. Indeed, it is acceptable in certain situations for a municipality to forbid commercial speech in its entirety in certain locations. *See Clear Channel*, 594 F.3d at 108. But when the third and fourth elements of *Central Hudson* are considered in tandem, this final portion of the test does not weigh sufficiently in favor of the City so as to render the fit between the means and ends reasonable.

The City may have had a stronger argument with respect to overall fit if, rather than prohibiting all advertisements, the regulations limited their placement, size, or some other manner in which they are presented. *See, e.g., Long Island Bd. of Realtors*, 277 F.3d at 628. Any devices displaying advertisements could, for instance, be required to be outfitted with a properly functioning on-off switch or a mute button. This would effectively leave the decision to be faced with such advertisements to the passenger, preventing any citizen from becoming a captive audience subjected to unwanted noise and imagery. The City rightfully points out that such limitations could result in a substantial burden on city officials to monitor compliance. These examples, however, are by no means an exhaustive set of alternatives, but are meant simply to illustrate the number of options, short of a complete ban on advertising, by which the city could pursue its articulated interest. Accordingly, the unnecessarily restrictive nature of the regulations

buttresses the Court's conclusion that the means employed by the regulations do not justify the ends sought by the City under *Central Hudson*.

## II. Remedy[8]

Vugo has made the requisite showing for the Court to grant an injunction prohibiting the City from enforcing 35 R.C.N.Y. §§ 59A-29(E) and 59B-29(E). *See Ognibene v. Parkes*, 671 F.3d 174, 182 (2d Cir. 2011) ("The party requesting permanent injunctive relief must demonstrate (1) irreparable harm (here, a constitutional violation) and (2) actual success on the merits."); *see also Int'l Dairy Foods Ass'n v. Amestoy*, 92 F.3d 67, 71 (2d Cir. 1996) ("It is established that 'the loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury.'" (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976))).

## CONCLUSION

For the foregoing reasons, Vugo's motion for summary judgment is granted and the City's motion for summary judgment is denied. The Clerk of Court is respectfully directed to terminate the motions pending at docket entries thirty-eight and forty-five.

SO ORDERED.

Dated: February 22, 2018
New York, New York

Ronnie Abrams
United States District Judge

---

[8] Vugo asserts both facial and as-applied challenges. The distinction between the two "goes to the breadth of the remedy employed by the Court, not what must be pleaded in a complaint." *Citizens United v. FEC*, 558 U.S. 310, 331 (2010). "Although facial challenges are generally disfavored, they are more readily accepted in the First Amendment context." *Beal v. Stern*, 184 F.3d 117, 125 (2d Cir. 1999). In this case, because Vugo's "constitutional argument is a general one" that "does not rest on factual assumptions that can be evaluated only in the context of an as-applied challenge," *see United States v. Stevens*, 559 U.S. 460, 473 n.3 (2010) (citations and internal quotation marks omitted), "it makes no difference of any substance whether this case is resolved by invalidating the statute on its face or as applied to [Vugo]," *Citizens United*, 558 U.S. at 376 (Roberts, C.J., concurring).